FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2016 SEP 29 PM 3: 31

CLERK _CAdens_
SO. DIST. OF GA.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### Dublin Division

THOMAS W. SIKES,                    *
                                    *
            *Plaintiff,*            *
                                    *        Case No. **C V 3 16 - 07 4**
v.                                  *
                                    *
UNITED STATES                       *
DEPARTMENT OF THE NAVY,             *
                                    *
            *Defendant.*            *

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
## PURSUANT TO THE FREEDOM OF INFORMATION ACT, 5 U.S.C. § 552, *et al*

I, Thomas W. Sikes, allege the following upon information and belief:

1. This is an action arising under a law of the United States, the Freedom of Information Act, 5 U.S.C. §552, *et seq, as amended* ("FOIA"); 28 U.S.C. §2201, the Federal Declaratory Judgment Act; and 28 U.S.C. §1651, the All Writs Act.

2. In addition the stand-alone FOIA requests that are summarized in paragraphs 40 through 43, below, Plaintiff contemplates the possible re-opening of *Sikes v. United States Department of the Navy*, 3:12-cv-00045 (S.D.GA), **Sikes I**, as noted in paragraph 36.  Based on new evidence obtained from the Navy's answers to FOIA requests submitted after the close of *Sikes I*, Plaintiff contemplates the possible reopening of that case, as summarized in paragraphs 32 through 39, below.  (It is more fully spelled out in paragraphs 44 through 81.) This first Cause of Action, which excludes paragraph 40, is a direct outgrowth of a request adjudicated in *Sikes I*. In the Second Cause of Action (summarized in paragraphs 41 through 43, below), Plaintiff seeks an answer to another post-litigation FOIA request, this request also related to Admiral Boorda.

**PARTIES**

3. Plaintiff, Thomas W. Sikes ("Sikes"), is an individual residing at 2769 Georgia Highway 117, P.O. Box 100, Cadwell, Laurens County, Georgia 31009.

4. Defendant, the United States Department of the Navy ("the Navy"), is a Department of the Executive Branch of the United States Government.  The Navy is an agency within the meaning of 5 U.S.C. §552(f).

**JURISDICTION AND VENUE**

5. This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. §552(a)(4)(B).  This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1331.  Venue lies in this District under 5 U.S.C. §552(a)(4)(B).

**INTRODUCTION**

6. Admiral J.M. Boorda (hereinafter "ADM Boorda" or "Boorda") was a remarkable figure: he is the only man in the history of the U.S. Navy to have risen from the lowest enlisted rank to Chief of Naval Operations.  ADM Boorda's meteoritic rise ended when he took his own life in May of 1996 for reasons that are far from clear - even now.

7. Plaintiff has been researching a book on the pressures of holding a military office; such as the pressures that appears to have driven ADM Boorda to end his life (and may have been unique to ADM Boorda).  In support of this research, Plaintiff submitted two Boorda-related FOIA requests to the Navy in 2011.

8. However, the materials produced by the Navy were incomplete.  After eight months of attempting to resolve the difficulties Plaintiff filed a lawsuit under the Freedom of Information

Act in May of 2012.   Even so, at the close of that suit, with respect to certain materials in response to the second of these requests the Navy has not authenticated its answer, notwithstanding Plaintiff's repeated requests that they do so.

9. In pursuit of additional answers related to Admiral Boorda, after the April 2014 close of the first lawsuit Plaintiff submitted eight follow-on FOIA requests (herein designated FOIA Requests 3 through 10), some of which are the subject of this litigation.

10. This matter concerns some of the eight follow-on requests. It is inspired in part by questions concerning information received in response to the first two FOIA requests.

### THE FIRST TWO FOIA REQUESTS

11. Originally, in August of 2011 Plaintiff submitted two FOIA requests to the Navy. **FOIA Request 1** (as designated during the ensuing litigation) asked for a complete list of invitees to the April 1994 change of command ceremony at which Admiral J.M. Boorda was sworn in as Chief of Naval Operations.   **FOIA Request 2** asked for "'a six page handwritten document which appear to be notes relating to official business' obtained from the back seat area of the Chief of Naval Operations' official vehicle on May 16, 1996 [the day of his suicide]. … Also requested is 'exhibit 36,' … if different from the above, as that exhibit is designated in [the NCIS Report of Investigation of ADM Boorda's Suicide]."

12. After eight months of extended interactions between the parties, during which time Plaintiff received less than half the names in response to Request 1, and only an extended runaround in response to Request 2, Plaintiff filed suit on May 24, 2012 under the provisions of the FOIA.   This became case # 3:12-cv-00045 (S.D.GA) (***Sikes I***), a case that was closed on April 7, 2014.

13. Soon after the *Sikes I* complaint was filed and before any further documents were filed or exchanged, the Department of Justice "voluntarily" produced to Plaintiff's attorney **eleven pages represented to be Exhibit 36** from the NCIS Report of Investigation of Admiral Boorda's Suicide.  This purported to respond to the entirety of FOIA Request 2.

14. The eleven-page Exhibit 36, as emailed to Plaintiff (through counsel) on June 27, 2012, included six handwritten pages alleged to be what is referred to below as Boorda's "Back Seat Notes."  Plaintiff's counsel had no first-hand knowledge about Exhibit 36.

15. Plaintiff's counsel subsequently sought clarification regarding what the document was responding to and whether it was a complete and accurate response to FOIA Request 2.

16. On July 13, the AUSA stated unequivocally in litigation pleadings that her abovementioned June 27 email to Plaintiff's attorney was responsive to FOIA 2, and that the Navy **"has not continued to withhold documents, and has released the requested information."**[1] (Emphasis Added)

17. Thereupon, on July 30, 2012, Plaintiff's attorney filed documents that included his Declaration that the AUSA on June 27 had "sent documents and information originally sought in Request 2 to me" via email.  This belief was based solely on good faith reliance on the representations made by the Department of Justice."[2]

18. In turn, pointing specifically to that Declaration by Plaintiff's initial attorney, the Court declared moot FOIA Request 2 as that Request pertained to *Sikes I*.[3]  Plaintiff's initial attorney departed the law firm shortly thereafter and a new attorney took over the matter.

---

[1] This statement in the Motion to Dismiss filed by the AUSA appears on page 12 of Docket Item 11 in *Sikes I*.
[2] This portion of the Declaration filed July 30, 2012 by the then-Plaintiff's attorney appears in the record as paragraph 7 of Docket Item 12-1 in *Sikes I*.
[3] The Court's language addressing this Declaration and its consequences appears on pages 10 through 12 of the ORDER dated January 10, 2013, seen as Docket Item 17 in *Sikes I*.

19. Months later, during the same action, Plaintiff's successor attorney who was with the same law firm informally emailed the AUSA in Savannah requesting that she ask some knowledgeable Navy official to certify to the authenticity of what the Navy had furnished in response to Request 2.[4]

20. Citing the Court's ruling of mootness, the AUSA discouraged Plaintiff's request, but relayed it by email to two senior Navy case managers for this action (attorneys at the Navy's JAG Headquarters in Washington).[5] Hearing nothing for a few days, Plaintiff's successor attorney placed on the litigation record a statement spelling out the kind of certification that he had informally requested.[6] He then waited for an answer without any response for three more months, at which point the case was closed.

21. Following the close of *Sikes I*, Plaintiff submitted to the Navy a succession of additional FOIA requests in an effort to learn more about matters related to Admiral Boorda. These follow-on requests are numbered here as Requests 3 through Request 10. They are explained more fully below.

## FOIA REQUESTS SUBMITTED AFTER THE CLOSE OF *SIKES I*

22. On April 21, 2014, Plaintiff filed **FOIA Request 3** seeking a copy of all FOIA requests mentioning Adm. Boorda that were submitted to the CNO's FOIA Office since the 1996 suicide.[7] That office only produced Plaintiff's own FOIA Request 1. Plaintiff filed an appeal on June 17, 2014. This resulted in an additional disclosure revealing two Boorda-related inquiries submitted from Congress. Interestingly, the CNO's FOIA Office maintained that it did not

---

[4] This is seen as "email #4" on page DD-28 within Exhibit D.
[5] The two Navy attorneys thereby notified of Plaintiff's request for verification were Major Antonio M. Contreras at JAG Headquarters and Mr. Grant E. Lattin, Director of the General Litigation Division at JAG Headquarters.
[6] This statement is in Docket Item #53 in *Sikes I*.
[7] At the times of the submission of these follow-on requests, and throughout the ensuing correspondence between Plaintiff and the Navy, these requests were identified only by the dates of their original submissions. These FOIA requests are numbered here for convenience of reference.

presently have any record on file of any FOIA request related to Admiral Boorda submitted by members of the general public.  In light of the Navy's position following administrative appeal, **Plaintiff does not seek relief with respect to FOIA Request 3**.

23. Also on April 21, 2014, Plaintiff filed FOIA Request 4 seeking all FOIA requests mentioning Admiral Boorda that were submitted to NCIS since his 1996 suicide.  In addition to copies of his own correspondence related to FOIA Request 2, Plaintiff received two FOIA requests submitted by writers, along with the NCIS replies.  As with FOIA Request 3, NCIS maintained they did not have on file any FOIA requests from members of the general public submitted in all the years since the suicide.  **Plaintiff does not seek relief with respect to FOIA Request 4**.

24. Because of the Navy's inexplicable three-month refusal during *Sikes I* to authenticate its answer to FOIA Request 2, on April 30, 2014, **Plaintiff submitted FOIA Request 5** to NCIS seeking an accurate and complete copy of the document requested in FOIA Request 2, which included Boorda's Back Seat Notes.  Plaintiff submitted Request 5 in an attempt to obtain additional responsive materials, or verification of the completeness and authenticity of what was previously provided during *Sikes I*.  In response, the Navy alleged that a complete and accurate copy had been provided during the course of *Sikes I*.  The Navy has steadfastly refused to authenticate its answer to FOIA Request 2 furnished during *Sikes I*, or to add to or modify that answer in response to FOIA Request 5.[8]  **Request 5 is important to this litigation.**

25. On May 1, 2014, Plaintiff filed FOIA Request 6 seeking documents identifying the full name, title and related information about G.S. Sykes, the NCIS Agent who found and inventoried Admiral Boorda's Back Seat Notes.  The Navy refused to provide such documents

---

[8] In the event of agency errors or misrepresentations involving FOIA, whether inadvertent or willfully fraudulent, requesters have little or no legal redress.

and Plaintiff appealed on June 9, 2014. Though the Navy denied the appeal, Plaintiff later obtained these details and contact information from other sources, thereby obviating the need to seek the information here. **Plaintiff does not seek relief with respect to FOIA Request 6**.

26. On June 19, 2014, Plaintiff submitted to NCIS FOIA Request 7 seeking copies of all versions of the back seat notes that had been sent to others, to the extent they differed from what was provided to Plaintiff in *Sikes I*. **Plaintiff does not seek relief with respect to FOIA Request 7**, *per se*. However, the related correspondence between Plaintiff and the Navy is presented as an example of the Navy's non-responsiveness, as part of a pattern of that agency's behavior in response to Boorda-related FOIA requests.

27. In the administrative appeals that followed FOIA Requests 5 and 7 Plaintiff asked that Defendant search, *inter alia*, in the files of the Office of the Judge Advocate General ("JAG Hdq") for the same requested documents. Because of the Navy's multiple entry points for submitting FOIA Requests, the portion of these two appeals asking for a search (also) at JAG Hdq gave rise automatically to what the Navy considered to be another request, here called FOIA Request 8. The request was denied and Plaintiff filed an appeal on July 25, 2014. That appeal was subsequently also denied. **Plaintiff does not seek relief with respect to FOIA Request 8**, *per se*. However, the related correspondence between Plaintiff and the Navy, seen in Exhibit G, is presented as evidence, as part of a pattern of that agency's behavior in response to Boorda-related FOIA requests. Paragraphs 74 through 76 explain the significance of Request 8.

28. On June 26, 2015 **Plaintiff submitted FOIA Request 9** to NCIS, which was a request in five parts. Part 1 requested records documenting release(s) of Boorda's Back Seat

Contents[9] to anyone outside NCIS. Part 2 requested names of persons to whom such release(s) were made. The Navy repeatedly evaded these first two parts. Parts 3 and 5 of Request 9 are not applicable here. Part 4 asked for documentation evidencing destruction of the Back Seat Contents. In response to Part 4, NCIS provided exactly the documentation requested, so no appeal of Part 4 was called for.

29. Plaintiff appealed Parts 1 and 2 of Request 9, but the Navy produced no records evidencing transfer of Boorda's Back Seat Contents to anyone, even to Plaintiff himself. In its response to the administrative appeal of Parts 1 and 2 the Navy was persistently evasive. **Plaintiff does not seek relief with respect to FOIA Request 9** *per se*, although the Navy's response to Part 4 and the Navy's repeated evasions of Parts 1 and 2 of FOIA Request 9 form an important part of this action.

30. On November 10, 2014 Plaintiff filed **FOIA Request 10** seeking a complete unredacted copy of the 1996 NCIS Report of Investigation of the suicide of Admiral Boorda (the "Report"). On August 13, 2015 Plaintiff received what is called here the (initial) 2015 redaction of the Report (a 230-plus document). Like the version of the document redacted in 2008, the 2015 redaction contained numerous withholdings, almost as numerous as in the earlier version. Plaintiff appealed these withholdings on October 9, 2015, but relatively few additional materials were forthcoming as a result. **The Navy's responses to FOIA Request 10** as well as continued withholdings of portions of the Report **form important elements of this litigation.**

---

[9] The back seat contents referenced in Request 9 are the same documents as Plaintiff asked for in FOIA Requests 2 and 5. The reference to the back seat contents in FOIA #9 (pages JJ-4 and JJ-5 in Exhibit J) is the same as the reference in FOIA #2, shown in *Sikes I* as Exhibit B on pages 12 through 15 (of 118) within Docket Item 30-3 there.

31. Based on the actions of the Navy described above, Plaintiff seeks relief related to FOIA Requests 5, 9 and 10, as requested in the causes of action listed below.  A few of the other above-referenced FOIA requests are further described below to provide context.

## SUMMARY OF THE FIRST CAUSE OF ACTION

32. **Certain facts and contradictions emerged from FOIA Requests 9 and 10.**  These are contradictions in the Navy's position strongly suggesting that the Navy did not provide a proper and correct answer when it responded to FOIA Request 2 during *Sikes I*.  **First:** when Plaintiff asked in FOIA Request 10 for a copy of the entire NCIS Report of Investigation, the Navy withheld Exhibit 36, despite case law saying that a document, once released, must be released in all subsequent FOIA requests.  **Second:** when Plaintiff asked in Parts 1 and 2 of FOIA Request 9 for a copy of records documenting the release of the Report's Exhibit 36 to anyone (to himself, for example), the Navy produce no evidence of having released Exhibit 36 to anyone.  **Third:** the Navy produced to Plaintiff (*three times*) a certain NCIS Memo stating that the Back Seat Contents found in Boorda's automobile were destroyed in 1998, despite the Navy's claim during *Sikes I* that they had furnished same to Plaintiff in 2012.  These thoughts are further developed in paragraphs 44 through 52, below.

33. **Plaintiff directs attention to several examples of apparent Navy bad faith** behavior before, during, and after the close of *Sikes I*.  These examples of bad faith are identified in paragraphs 53 through 62.

34. Because of the contradictions referenced in paragraphs 44 through 52, and because of instances of apparent Navy bad faith referenced in paragraphs 53 through 62, **Plaintiff asks the Court to obtain** from the Navy, for purposes of *in camera* review, **an authentic copy of the**

entire NCIS Report of Investigation of Admiral Boorda's Suicide.  Such *in camera* review is appropriate despite the Court's earlier finding of mootness regarding FOIA Request 2 because the above contradictions, all discovered since the close of *Sikes I*, cast serious doubt as to the good faith of the Navy's representations at the time they produced Exhibit 36 in 2012.  As cited in paragraphs 65 and 66, below, case law holds, *inter alia*, that **"Where there is evidence of bad faith on the part of the agency, the representations of the agency lose all trustworthiness. *In camera* inspection in such situations is 'plainly necessary' ..."**  The request for *in camera* review is addressed more broadly in paragraphs 63 through 66.

35.  Plaintiff asks the Court to use the *in camera* copy of the entire NCIS Report of Investigation to **determine whether any substitution was made** in any portion of Exhibit 36 when the Navy responded to FOIA Request 2 in June 2012.  That Navy response in June 2012 is identified in paragraph 67, below.

36.  **If the Court finds that any such substitution was made by the Navy, Plaintiff asks the Court to re-open *Sikes I*** as it pertains to FOIA Request 2.  Request 2 asked for a copy of Exhibit 36, including a copy of "'a six page handwritten document which appear[s] to be notes relating to official business' obtained from the back seat area of the Chief of Naval Operations' official vehicle on May 16, 1996."  (This request is repeated in paragraph 68, below.)

37.  **Plaintiff asks the Court to consider and rule on whether such substitution, if any, was fraudulent,** based in part on the numerous occasions during *Sikes I* and in subsequent correspondence when the Navy's attention was directed to the question of authenticity of the material provided.  Evidence suggesting willful intent to perpetuate the deception appears in

paragraphs 69 through 80, below.  Those paragraphs gainsay the possibility that any such substitution might have taken place inadvertently when the Navy produced Exhibit 36 June 2012.

38. After the Court has obtained the entire, unredacted Report of Investigation for *in camera* review, and before the Court rules on the question set forth above in paragraph 37, Plaintiff requests an opportunity to be heard further regarding whether the substitution, if any, was fraudulent.  Regarding possible remedy in the event fraud is found, see paragraph 81, below.

39. If the Court finds affirmatively regarding paragraph 35, on that basis **Plaintiff asks the Court to order the Navy to provide a correct, complete response to FOIA Request 2** which asked for the same material asked for in FOIA Request 5: a complete and correct copy of Exhibit 36 from the NCIS Report of Investigation of Admiral Boorda's Suicide, **and to publish same** on the litigation record.

40. **Aside from the question of re-opening *Sikes I*,** on a stand-alone basis **FOIA Request 5 is a new request dated April 30, 2014,** submitted after the close of *Sikes I*.  (It is set forth succinctly in the second and third paragraphs on page DD-7 and in more detail on pages DD-8 through DD-10, all in Exhibit D.)  While there might be no requirement in the FOIA for the Navy to certify its answer to Request 2 <u>during</u> *Sikes I*, still, there is no prohibition in the FOIA against the submission of a new request, even if that new request asks for the same material as earlier requested.  Nothing in the FOIA says a new request is any less entitled to a fresh search and respectful treatment in accordance with 5 U.S.C. §552, even if that new request asks for the same document as someone previously requested, *whether or not* the new requester is the same party as the original requester.  Accordingly, if not otherwise resolved pursuant to the foregoing, **Plaintiff asks the Court to order the Navy to provide a proper and correct response to FOIA Request 5,** which asked for Exhibit 36 from the NCIS Report of

Investigation.  As noted in that Report (see page 71 in Exhibit K2, or equivalently, see pages

DD-10 and DD-14 in Exhibit D), Exhibit 36 includes Boorda's Back Seat Notes.

## SUMMARY OF SECOND CAUSE OF ACTION

41.   FOIA Request 10 asked the Navy to provide a copy of the entire, unredacted NCIS

Report of Investigation of Admiral Boorda's suicide.  The Navy's 2015/2016 response redacted

many passages.  Plaintiff appealed all of the withholdings except the Back Seat Notes portion of

Exhibit 36, which had allegedly been delivered to Plaintiff on the litigation record in June of

2012.

42.  Of special interest here in the Second Cause of Action is the fact that the Navy

presented in unredacted (albeit blurred) form the entirety page 34 of the 2015 redaction of the

NCIS Report, which is part of that Report's Exhibit 5.  It appears that the right side of the lower

photo on this page 34 might have also become Exhibit 16 later in the Report.  The Navy withheld

entirely Exhibit 16, which was Admiral Boorda's suicide note to his wife.

43. **As the Second Cause of Action, Plaintiff asks the Court to direct the Navy to**

**provide** on the record an authenticated and properly focused copy of (the heretofore-released-in-

blurred-form) page 34 from the 2015 redaction of the Report, **or** to provide certified

confirmation that the lower right side of a clearly focused version of page 34 from the 2015

redaction (Exhibit K2) is different from a certain Putative Copy to be furnished by Plaintiff, if

indeed they are different, **or,** to provide an authenticated, unredacted copy of Exhibit 16 from the

2015 redaction.  This request is further developed in paragraphs 83, ff, below.

## DEVELOPMENT OF THE FIRST CAUSE OF ACTION

### Facts and Contradictions suggesting Incorrect Substitution upon delivery of Exhibit 36 in 2012

44.  Paragraph 32, above, directs attention to certain facts and contradictions recently

emergent that suggest Defendant's response to FOIA Request 2 as provided during *Sikes I*, might

have involved one or more substitutions rather than the actual content of Exhibit 36 from the

NCIS Report of Investigation.  **Consider first** the contradiction in the Navy's position arising

out of Defendant's response to **FOIA Request 10**, which asked for an unredacted copy of the

entire NCIS Report of Investigation of ADM Boorda's suicide.[10]  When the Navy responded in

2015/2016 they withheld the handwritten portions of Exhibit 36, which portions, according to

what the Navy released to Plaintiff in June of 2012 during *Sikes I*,[11] included Boorda's Back Seat

Notes.

45.  When an agency is responding to a FOIA request for a document already officially

released, case law holds that the agency cannot withhold that document in connection with

subsequent FOIA requests for the same document.[12]  If the Navy had furnished an accurate copy

---

[10] FOIA Request 10 itself appears on page KK-4 in Exhibit K1.  The overall correspondence between Plaintiff and Defendant involving Request 10 appears on pages KK-1 through KK-42 within Exhibit K1.  The specific point at issue here is the Navy's non-production (in 2015, in response to Request 10) of the handwritten portions of the Report's Exhibit 36.  This is seen on pages 171-181 in Exhibit K2.

[11] The Navy's 2012 release of Exhibit 36 appears on pages 8 through 13 in Docket Item 30-7 in Sikes I.  This was among the exhibits Jointly Stipulated.

[12] A well-established principle of FOIA law is that the agency cannot withhold a document previously released.  See *Fitzgibbon v C.I.A.*, 911 F.2d 755, 765 (D.C. Cir. 1990):  "In *Afshar*, we concluded that **when information has been "officially acknowledged," its disclosure may be compelled, even over an agency's otherwise valid exemption claim.**  For an item to be "officially acknowledged," however, we established three criteria.  First, the information requested must be as specific as the information previously released.  Second, the information requested must match the information previously disclosed; we noted, for example, that official disclosure did not waive the protection to be accorded information that pertained to a later time period.  Third, we held that the information must have been made public through an official and documented disclosure."  *Afshar v Dept. of State*, 702 F.2d at 1133 (emphasis added)

In the instant case, all of these three tests are met.  The third test is met via joint stipulation in the PACER system during *Sikes I*.  See also *Public Citizen v Department of State*, 11 F.3d 198, 202 (D.C. Cir. 1993).  *Public Citizen* also pointed to *Afshar*, and to precisely the above passage from *Fitzgibbon*.

13

of Exhibit 36 during *Sikes I* they would have been obligated to release that same material again in 2015, rather than withholding most of it.[13]  The Navy's decision to withhold nine of the eleven pages of Exhibit 36 from its 2015 redaction of the Report of Investigation is a strong indication that what they *did* release to Plaintiff in June 2012 involved a substitution during *Sikes I*, rather than the actual Exhibit 36.

46. Paragraph 32, above, directs attention to certain facts and contradictions recently emergent that suggest Defendant's response to FOIA Request 2 as provided during *Sikes I*, might have involved one or more substitutions rather than the actual content of Exhibit 36 from the NCIS Report of Investigation.  **Consider second** the contradiction inherent in the Navy's response to **Part 1 of FOIA Request 9**.  This Part asked for "**any and all records documenting the transmission or release of [Boorda's] back seat contents,** or copies thereof, **to any parties outside NCIS,** regardless of who those parties might be."[14]  The "Back Seat Contents" referred to were unambiguously the handwritten pages enclosed with Exhibit 36 from the NCIS Report, pages explicitly identified in FOIA Request 2 and allegedly furnished to Plaintiff in June 2012 during *Sikes I*.[15]  These pages are what is elsewhere referred to as Boorda's Back Seat Notes, notes that were included within Exhibit 36 from the NCIS Report of Investigation, an Exhibit that NCIS had allegedly transferred to DOJ *or to someone* for ultimate release to Plaintiff during *Sikes I*.

---

[13] To verify that the Navy withheld most of Exhibit 36 from the 2015 redaction, see pp. 171 thru 181 in Exhibit K2.

[14] Part 1 of FOIA Request 9 itself appears on page JJ-4 in Exhibit J.  The overall correspondence between Plaintiff and Defendant involving (all of) Request 9 appears on pages JJ-1 through JJ-26 within Exhibit J. Regarding Part 1 of FOIA Request 9: the specific point at issue here is the fact that the Navy did not produce *any* records documenting transfer of Boorda's Back Notes *to anyone*.  This suggests that no such transfers of the *actual* Notes had ever been made, which in turn suggests that what was delivered to Plaintiff during *Sikes I* involved some sort of substitution.

[15] The Back Seat Contents referenced in Request 9 are the same documents as Plaintiff asked for in FOIA Requests 2 and 5.  *Compare* FOIA #9 (pages JJ-4 and JJ-5 in Exhibit J) with FOIA #2, shown as Exhibit B on pages 12 through 15 (of 118) within Docket Item 30-3 in *Sikes I*.

47. Despite extended correspondence involving multiple repetitions by Plaintiff of this Part of Request 9, **in response to Part 1 of Request 9, NCIS did not produce *any* records evidencing their having released Boorda's Back Seat Notes *to anyone*, nor did the Navy either suggest or deny the existence of such records, or claim inability to find.** These facts indicate that what the Navy provided to Plaintiff during *Sikes I* involved some sort of substitution rather than the actual contents of Exhibit 36. If they had transferred to Plaintiff or anyone else the actual Back Seat Notes they would have been obligated to address Part 1 of FOIA Request 9, and to respond to whether they had records of such transfer.

48. Paragraph 32, above, directs attention tor certain facts and contradictions suggesting Defendant did not properly respond to FOIA Request 2 during *Sikes I*. **Consider third** a remarkable NCIS Memo dated May 4, 1998, which was two years after the suicide. After the close of *Sikes I*, **this NCIS Memo was provided to Plaintiff by the Navy on three separate occasions**, with the first two occasions being the most interesting. **The first time** a copy of this Memo was furnished to Plaintiff was not in direct response to any of this series of FOIA requests. Instead, **this Memo was *volunteered* by JAG Headquarters**, beginning with a July 10, 2014 letter to Plaintiff, a letter stating that the Memo was found among their own files, and "may be of interest to you."[16]

49. **This volunteered Memo of May 4, 1998,** originally prepared by NCIS but discovered in the files of JAG Headquarters, **said that the materials found in the back seat of Admiral Boorda's car were destroyed in April of 1998** in the presence of a witness.[17] **However, in direct conflict with this message in the volunteered 1998 Memo, the DOJ**

---

[16] This first reference to the May 4, 1998 Memo is seen on page BB-9 (Exhibit B1) of the July 10 letter from Mr. G.E. Lattin of OJAG Headquarters. (This letter was OJAG's comprehensive denial letter for FOIA Requests 3 through 7.) The remaining correspondence involving the volunteered Memo of May 4, 1998 is in Exhibit H.
[17] The volunteered Memo itself appears on pages HH-5 and HH-6 in Exhibit H.

**attorney representing the Navy claimed she delivered Boorda's Back Seat Notes to Plaintiff in June of 2012** during *Sikes I*.

50. **The second time** a copy of this Memo was furnished to Plaintiff by the Navy came a year later, in July of 2015, with this (essentially identical) copy supposedly originating from within the files of NCIS. This time, the May 4, 1998 Memo was furnished specifically in answer to **Part 4 of FOIA Request 9**, which asked NCIS for documents evidencing the destruction of the back seat contents of Boorda's official vehicle, if such destruction has occurred. (Part 4 of Request 9 asked for evidence of destruction of precisely the same documents as Plaintiff had asked for in FOIA Request 2 and allegedly received during *Sikes I*. Request 2 is seen on page DD-8.) In response, NCIS furnished this same May 4, 1998 Memo, a Memo indicating that the same Back Seat Notes had been destroyed on April 28, 1998.[18]

51. Recall that during *Sikes I* the Navy claimed they produced Boorda's Back Seat Notes as part of a proper response to Plaintiff's FOIA Request 2. But, according to this May 4, 1998 NCIS Memo, the handwritten notes from the Admiral's car "were destroyed" by NCIS officials on April 28, 1998.[19] Thus, with this Memo, the Navy has offered a second and *diametrically opposed* set of facts concerning the fate of notes found in Boorda's automobile. **This pair of contradictory accounts cannot both stand**.

---

[18] The specific content of Part 4 of Request 9, and the Navy's response, are seen on pages JJ-4 and JJ-5 (presenting the FOIA request), and on page JJ-9 (for the Navy's response), both in Exhibit J. No distinction between originals versus copies was drawn by Plaintiff, or Defendant, in any of their Request 9 correspondence.

[19] Notwithstanding this supposed destruction in 1998, when the 2015 redaction of the NCIS Report of Investigation (Exhibit K2) took place, nine pages apparently *remained* in the Report (although redacted in full), immediately following the cover Memo for Exhibit 36 – just enough pages to match the 6 pages for Back Seat Notes, plus the three pages for misc telephone messages. This omission of nine pages is seen on pages 171 through 181, or equivalently, pages 442 through 452, in Exhibit K2. If Boorda's Back Seat Notes were destroyed in 1998, what are those (6+3) *remaining pages* (albeit fully-redacted) that are indicated in the 2015 version (Exhibit K2)?

52. This May 4, 1998 Memo was delivered to Plaintiff three times.  (The third time is on page 3 of Exhibit K2.)  The contradiction noted here in paragraph 51 is a *third* indication that what was delivered in June 2012 to Plaintiff as Boorda's Back Seat Notes is of questionable authenticity.

<u>Examples of Apparent Navy Bad Faith before, during, and after *Sikes I*</u>

53. Following paragraph 33, above, consider, as the **<u>first example</u>** of what appears to be bad faith behavior, that during the course of *Sikes I* **the Court found the suggestion of bad faith** in the succession of excuses offered by the Navy for their delay in producing their response to FOIA Request 2.[20]

54. Following paragraph 33, above, consider, as the **<u>second example</u>** of what appears to be bad faith behavior:  In coming up with its response to FOIA Request 2 (first submitted at the end of August of 2011), **the Navy required nine months to accomplish what should have been a search of less than a week**.  FOIA 2 asked for a specific exhibit number among 73 such exhibits appearing in numerical order in the overall Report of Investigation.  How long should it take to find Exhibit 36 in one of the most high profile Reports ever done by NCIS?

55. Following paragraph 33, above, consider, as the **<u>third example</u>** of what appears to be bad faith behavior, **the Anacostia runaround** in October of 2011 leading up to the filing of *Sikes I*.[21]  Plaintiff submitted FOIA Request 2 to NCIS Hdq/Quantico, asking for access to Boorda's Back Seat Notes.[22]  After extended delays, the NCIS FOIA Office in October 2011 sent

---

[20] Within *Sikes I*, the Court's ORDER dated December 6, 2013 found the suggestion of Navy bad faith on pages 34, 35, and 40.

[21] Following Plaintiff's brief reference to this event in his administrative appeal of FOIA 5, the OJAG reply letter of July 10, 2014, seen on page DD-31 of Exhibit D said, "You fail to explain, however, how … [your] being directed to an NCIS office in Anacostia supports your contention that NCIS's search was inadequate."  The relevance of Anacostia is explained here.  It exemplifies how Plaintiff's request for a search in this case yielded only a runaround.

[22] FOIA Request 2 as submitted to NCIS/Quantico in Aug 2011 appeared as Exhibit B in *Sikes I*; it is also seen on pages DD-8 through DD-10 in Exhibit D, where it is included within (and is considered part of) FOIA 5.

Plaintiff on a snipe hunt to an unnamed evidence technician in the NCIS Washington Field Office in Anacostia.[23]

56. **This referral of Plaintiff to WFO/Anacostia was not done by NCIS Hdq/Quantico in good faith, as evidenced by four considerations:** (1) NCIS Hdq/Quantico refused Plaintiff's request for a Point of Contact at Anacostia;[24] (2) Contrary to statute, Quantico refused Plaintiff's repeated requests for a explicitly identified tracking number;[25] (3) Neither Anacostia nor NCIS Hdq/Quantico followed up on the latter's request that Anacostia reply directly to Plaintiff regarding FOIA Request 2;[26] and especially (4) NCIS Hdq/Quantico sent Plaintiff to the Washington Field Office of NCIS in Anacostia for the requested document, despite Quantico's having in their own possession two copies (in two file locations) of a short Memo dated May 4, 1998 saying that Anacostia's copy of the requested document had been ceremoniously destroyed in 1998.[27]

---

[23] The events of this Anacostia referral are well-documented on the record of *Sikes I*, as shown in Exhibits X, V, U, O, and Q in *Sikes I*, all of which were admitted in that action by Joint Stipulation. They all appear within Docket Item 30-3. In particular, a well-documented Log of events associated with this referral appears as Exhibit X; it is seen on pages 113 through 118 within Docket Item 30-3. The NCIS referral of Plaintiff to Anacostia is seen in Log Entries 13, 14, and 17, and in a letter shown as Exhibit V (page 107 of Docket Entry 30-3). Regarding the "turned-sideways-on-the-page" Log, readers are encouraged to click on "VIEW" at the top of the screen, then hit "rotate clockwise."

[24] Regarding absence of a Point of Contact at Anacostia, see Entries 32 and 33 in the Log (page 116 of 118) in Docket Entry 30-3. See also the "supplement to (Log) Entry 33," located at the conclusion of page 117 of 118.
[25] One sometimes-heard statement is that when the Navy writes a letter related to a particular FOIA request, the number in the upper right corner, just above the letter's Serial number, is the tracking number for that FOIA request. This has never been confirmed to Plaintiff in regard to any of Plaintiff's FOIA requests to NCIS, despite numerous pleas to NCIS for an explicitly identified tracking number. Whether this statement is true or not, the two letters from NCIS relevant here (seen in Exhibit U and Exhibit V on pp 104 - 107 (of 118) in Docket Item 30-3 in *Sikes I*) had different numbers in the position above the serial numbers in the respective letters, leaving unclear what the tracking number for Request 2 might be.

[26] Anacostia did not comply with Quantico's request that they reply directly to the requester (requested by Quantico in Exhibit V, page 107 (of 118) in Docket Item 30-3 in *Sikes I*); nor did Quantico itself respond further. (Absence of *any* response is identified in first two lines of Log Entry 36: page 116 (of 118) in Docket Item 30-3 in *Sikes I*)

[27] This Memo is discussed in paragraphs 48 through 52 of this Complaint, above. The first copy of this Memo to reach Plaintiff was "volunteered" by JAG Hdq.; it came from OJAG's own files. The second copy of this 1998 Memo to reach Plaintiff came from the files of NCIS, in response to Plaintiff's request in Part 4 of FOIA 9, which asked for documents evidencing destruction of Boorda's Back Seat Notes, i.e., the destruction of the handwritten

57. Following paragraph 33, above, consider, as the **fourth example** of what appears to be bad faith behavior, the fact that **the Navy refused to acknowledge or address FOIA Request 7**,[28] submitted after the close of *Sikes I*. In paraphrase, Request 7 asked for all material responsive to FOIA Request 2, *other than* what was previously furnished to Plaintiff's attorney during *Sikes I*, that at any time since August 26, 2011 might have been furnished by the Navy to anyone.[29]

58. What reflects bad faith about the Navy's responses to Request 7 is that (1) following Plaintiff's submission of this FOIA request, the Navy (NCIS), pursuant to direction from JAG Headquarters, explicitly refused to provide an initial determination; (2) even though Request 7 was submitted to NCIS, and asked for a search of the files at NCIS, at no point throughout the correspondence did any Navy representative in any Navy office claim that a search was conducted among the files of NCIS;[30] and, in sum, (3) despite the statutory requirement at 5 U.S.C. §552, the Navy provided no meaningful response to Request 7. Along with offering many words "off the subject," **the Navy essentially ignored FOIA Request 7**.

59. Following paragraph 33, above, consider, as the fifth through seventh examples of what appears to be bad faith behavior, the three contradictions already described above:

---

part of Exhibit 36 from the NCIS Report. Later a third copy reached Plaintiff. That third copy, *also* from the files of NCIS, appeared as page 3 in Exhibit K2, which is the (initial) 2015 redaction. (Interestingly, this Memo did not appear at all in the 2008 redaction of the NCIS Report; see Exhibit B2 and Exhibit B3.)

[28] All ten of Plaintiff's FOIA Requests are summarized in the two page "Exhibit A1." (See also the eight-page version: "Exhibit A2.") Because of the Navy's multiple entry points for submitting FOIA Requests, certain wording within Plaintiff's appeal of FOIA Request 7 gave rise automatically to what the Navy considered to be another request, here called Request 8. If a request calls for a search of files at JAG Headquarters, then JAG Hdq is considered a separate entry point. The significance of Request 8 is discussed in paragraphs 74 through 76.

[29] The actual text of FOIA Request 7 appears on the bottom third of page FF-3 in Exhibit F.

[30] All of the correspondence involving FOIA Request 7 and Request 8 is *documented* in Exhibits F and G.

60. As the **fifth example** of apparent Navy bad faith, already described in paragraphs 44 and 45, above, observe **the complete withholding of the final nine pages of the eleven pages in Exhibit 36** (including Boorda's Back Seat Notes) **when the Navy issued the 2015 redaction** of the NCIS Report of Investigation of Admiral Boorda's suicide, **despite having allegedly released those same pages publically to Plaintiff in June of 2012.**

61. As the **sixth example** of apparent Navy bad faith, already described in paragraphs 46 and 47, above, observe the Navy's **refusal to produce any records** (or to deny their ability to locate such records, or to defend their non-production) **documenting the release or transfer of Boorda's Back Seat Notes** (and the rest of Exhibit 36) *to anyone* in the time since Plaintiff's original request for these notes in August of 2011.[31]  Further, in declining to produce such transfer records, the Navy engaged in extensively evasive correspondence with Plaintiff regarding his FOIA request for same.[32]

62. As the **seventh example** of what appears to be Navy bad faith, observe the Navy's **refusal to reconcile or clarify the NCIS Memo of May 4, 1998 stating that Boorda's Back Seat Contents were destroyed in 1998, when those notes were allegedly produced to Plaintiff 14 years later in 2012**.  This is further described in paragraph 48 through 52, above.

63. **In view of all of the foregoing**, and as suggested in paragraph 34, above, the Court is asked to obtain from the Navy for purposes of *in camera* review an authentic copy of the entire NCIS Report of Investigation of Admiral Boorda's suicide, to enable the Court to determine

---

[31] For example, in June of 2012 the Navy allegedly released Exhibit 36 to Plaintiff (via the AUSA in Savannah). Why can't the Navy produce the records evidencing that release?
[32] To observe in Exhibit J the Navy's repeatedly non-responsive correspondence regarding Part 1 of FOIA 9, see the NCIS response letters which each time evaded Plaintiff's repeated requests for an answer to Part 1.

whether a substitution was made in (portions of) Exhibit 36 at the time the Navy responded to FOIA Request 2 in June of 2012.

64. Such *in camera* review is appropriate primarily because, despite the Court's earlier finding of mootness of Plaintiff's claim regarding FOIA Request 2, the contradictions in paragraphs 44 through 52, all discovered since the close of *Sikes I*, cast serious doubt as to the accuracy and good faith of the Navy's representations at the time they produced the requested document during that litigation.

65. In addition, such *in camera* review is appropriate because of the Navy's record of bad faith in numerous instances related to Plaintiff's FOIA Requests involving the late Admiral Boorda, including those identified in paragraphs 53 through 62, above.  The Court has authority to conduct *in camera* review, as established by statute and precedent.[33]

66. The court *is encouraged* to do an *in camera* inspection by *Spirko v U.S. Postal Service*, 147 F.3d 992, 996 (D.C. Cir. 1998):  **"... the court has specifically noted 'that *in camera* inspection may be particularly appropriate when ... there is evidence of bad faith on the part of the agency' ..."** See also *Allen v Central Intelligence Agency*, 636 F.2d 1287, 1298 (D.C. Cir. 1980): **"Where there is evidence of bad faith on the part of the agency, the representations of the agency lose all trustworthiness.  *In camera* inspection in such situations is 'plainly necessary' ..."[34]**

67. As suggested in paragraph 35, above, the Court is requested to **determine from the Navy's *in camera* submission whether any substitution was made** in any portion of Exhibit 36 when the Navy responded to FOIA Request 2 during *Sikes I*.  What the Navy provided as

---

[33] The statutory authority is at 5 U.S.C. §552(a)(4)(B).  This authority is recognized in *Spirko v U.S. Postal Service*, 147 F.3d 992, 996 (D.C. Cir. 1998).
[34] See also *Ray v Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978) supporting *in camera* review.

Exhibit 36 is found in Docket Item 30-7, admitted by Joint Stipulation in *Sikes I*.[35]  A copy is also found within pages DD-11 through DD-23 in Exhibit D.

68. As suggested in paragraph 36, if the Court finds that any substitution was made by the Navy, the Court is asked to re-open *Sikes I* as it pertains to the Navy's answers provided during that action.

<u>In view of Defendant's June 2012 substitution of Exhibit 36, if any, and in view of Defendant's Evasion of Request 5, **Was there Fraud** during *Sikes I* or subsequently regarding Request 5?</u>

69. As suggested in paragraphs 37 and 38, above, the Court is asked to consider and rule on whether such substitution, if any, was fraudulent, based on numerous occasions during *Sikes I*, and in FOIA correspondence subsequent to *Sikes I*, when the Navy's attention was directed to the issue of their Response to FOIA Request 2 and directed to their answer to FOIA Request 5 (which *also* asked for Exhibit 36), in view of the actual content of Exhibit 36. Considerations suggesting that any substitution in Exhibit 36 should be considered fraudulent are enumerated in paragraphs 70 through 80, below.

70. **Consider the** <u>**content of FOIA Request 5 itself**</u>, a request submitted after the close of *Sikes I*. In essence, **Request 5 asked for "a *complete* copy of all material requested by me on August 26, 2011 in [FOIA Request 2]."**[36]  In the instant context Request 5 said, in loose paraphrase, "What Request 5 asks for is an accurate, complete copy of what Request 2 asked

---

[35] In Docket Item 30-7 within *Sikes I*, see, in particular, pages 6 through 16.  See also the AUSA's statements about the Navy's response to FOIA Request 2, statements wherein the Navy affirmed unequivocally in pleadings that they had properly and completely furnished to Plaintiff the answer to FOIA 2.

[36] The entire correspondence between Plaintiff and the Navy regarding FOIA Request 5 is in Exhibit D (pages DD-1 through DD-32).  The request *letter* for Request 5 is on pages DD-6 and DD-7, with an accompanying copy of the original FOIA Request 2 appearing as pages DD-8 through DD-10.  However, Request 5 *as submitted* encompassed 19 pages (pages DD-6 through DD-23).  The extra pages included the Navy's June 2012 response to Request 2 as sent to Plaintiff by the AUSA representing the Navy (a response seen on pp DD-11 through DD-23 in Exhibit D), and the Plaintiff's January 2014 notice on the record of *Sikes I* regarding Plaintiff's request for verification of that response by an appropriate Navy official (seen as page DD-23).

for," and "Here is the response you provided when answering Request 2," and "Plaintiff is interested in obtaining Navy confirmation of that response."  Absent fraud, if Defendant was aware, *or*, while processing Requests 5, 8, or 10 *became aware*, of a substitution in its answer provided during *Sikes I*, the Navy could not have left intact their answer to Request 2, *and* left intact their terse brush-aside of Request 5 shown on page DD-25 (in Exhibit D).

71.  **The administrative appeal of FOIA Request 5 asked explicitly that the Navy conduct an additional search.**[37]  In response to this appeal, the Navy denied Plaintiff's request for an additional search.[38]  Perhaps the key to the Navy's inability to find Exhibit 36 from the NCIS Report of Investigation of Boorda's suicide is that they appear not to have looked in that Report itself.  **Failure of the Navy to look *in the Report itself* for what Plaintiff identified as an Exhibit from that Report seems willful evasion**, especially in view of the appeal's request for "an additional search" at "all other applicable Navy locations."

72.  The correspondence involving FOIA Request 5 included full particulars of Plaintiff's efforts during *Sikes I* to obtain verification from an agency official of the Navy's June 2012 response to Request 2.  The original submission of Request 5 included (as page DD-24) a copy of Plaintiff's notice on the litigation record of *Sikes I*, a notice expressing an interest in verification of what the Navy had provided in response to Request 2.  Request 5 was submitted initially to the FOIA Officer at NCIS.[39]  Furthermore, there was a reminder in the appeal letter

---

[37]  Correspondence documenting Plaintiff's request for an additional search for material responsive to Request 5 is in the appeal letter in paragraph (5) on page DD-2, and again in paragraph (25) on page DD-5 (in Exhibit D).

[38]  Denial by JAG Hdq of an additional search is documented in the top paragraph on page DD-32 (in Exhibit D). This is repeated from the top paragraph of page BB-5 (in Exhibit B1).

[39]  Had he been so inclined, the FOIA Officer at NCIS/Quantico could have responded (upon receiving Request 5, two months after the close of *Sikes I*) to this Request for verification of Request 2.  If no substitution had been involved in the Navy's answer to Request 2, the answer to Request 5 obviously would have been the same as to Request 2.

itself (in addition to the reminders in References A and D attached thereto) of Plaintiff's interest in a verified response to FOIA Requests 2 and 5.[40]

73. When Plaintiff's administrative appeal of Request 5 was filed, the Director of the General Litigation Division at JAG Headquarters was presented explicitly, for the second time, with a reminder of efforts by Plaintiff to obtain verification of the Navy's answer to Request 2.[41] These requests for verification, as reaffirmed during the administrative appeal of Request 5, would inevitably have drawn attention within JAG Headquarters again to possible confusion within Navy councils regarding the accuracy of the Navy's response to Request 2, which essentially asked for the same thing as Request 5. In other words, if the Navy got it wrong in answering FOIA Request 2 in June 2012, and with Request 5 now refreshing the focus on documents asked for in Request 2, *by this stage* in the correspondence Mr. Lattin could hardly have let it *stay* wrong without doing so consciously and thus deliberately.

74. In the aftermath of FOIA Requests 5 and 7 and their appeals, there came to exist what is here called Request 8, which was a request for a search for the requested documents *in the files of JAG Headquarters*.[42]

---

[40] See paragraphs (18) thru (22) on page DD-4 of the administrative appeal letter for FOIA Request 5 (Exhibit D).
[41] **The first time** appeared in the AUSA's email to Plaintiff's successor counsel, with that email copied to OJAG on December 30, 2013 during *Sikes I*; see page DD-28 in Exhibit D). **The second time** was June 8, 2014 when Plaintiff submitted an administrative appeal of the Navy's answer to FOIA Request 5, which appeal included within it another copy of that same email (here seen on page DD-28 in Exhibit D), **but supplemented** (*in* the copy accompanying the appeal) by Plaintiff's (handwritten) response to the AUSA's original December 30, 2013 email.

**In that December 30, 2013 email to Plaintiff, the AUSA in Savannah said,** "you challenged the personal knowledge of those who provided information previously by declaration." **The Plaintiff's response,** *included in the administrative appeal for Request 5* (page DD-28), was that *if there ever had been* such a declaration it never reached the litigation record *or* the attorney for the Plaintiff. (Extensive subsequent investigation has confirmed this.) In sum, the handwriting on the upper half of page DD-28 in Exhibit D cried out for a reply from Defendant. For example, if such a declaration actually existed, JAG Hdq could have included a copy with its reply letter in June of 2014. No reply of any sort addressing the declaration referenced by the Savannah AUSA was sent to Plaintiff, **nor did the Navy ever address this key point regarding the supposed "declaration" alleged in the AUSA's December 30, 2013 email to Plaintiff.**

[42] Regarding Request 8, attention is limited here to the requested search in the files of JAG Headquarters for documents responsive to Request 5.

75. When Plaintiff filed an **administrative appeal for FOIA Request 8**, that appeal contained an extensive focus on Plaintiff's prior requests for authentication of the Navy's answers to Request 5.[43]  Captain K.A. Foster of JAG Headquarters answered this appeal on behalf of the Navy.[44]  He repeated the Navy's earlier denial of requests for certification of their answer to these requests, denials in letters previously sent to Plaintiff by Director Lattin.  Thus, Captain Foster appears to be another a senior Navy attorney who has considered but declined to issue a pronouncement on whether the agency's earlier answer accurately reflected the content of Exhibit 36 in the NCIS Report of Investigation.  Are we to believe that throughout all these occasions when this issue was raised, no Navy official looked at the NCIS Report to see whether they had correctly presented the content of Exhibit 36?

76. A the time of Captain Foster's reply to the appeal of FOIA Request 8 (i.e, August 2014), with no litigation in process, and no concerns about unfavorable precedents that might reach the public record, if the Navy's hands are clean why not just go ahead and certify at that point?

77. **FOIA Request 10** asked for a complete, unredacted copy of the entire Report of Investigation.[45]  In connection with this request, **another reminder arose for the Navy to focus attention on and to consider the accuracy of what was delivered (in 2012) as Exhibit 36.**  Exhibit 36 included Boorda's Back Seat Notes.  In response to Request 10

---

[43] The appeal letter's *references* directing attention to authentication were References 4 and 5, as identified on pages GG-4 and GG-5 (aka GG-14 and GG-15) in Exhibit G. *Documentation* of the (Request 8) appeal's extended treatment of authentication *in the appeal letter itself* is on pages GG-6 and GG-7 (aka GG-16 and GG-17).
[44] Captain Foster's reply to the appeal of Request 8 is on pages GG-10 through GG-13 (aka GG-20 through GG-23).
[45] The Request letter itself appears on page KK-4 in Exhibit K1.  The *correspondence* regarding Request 10 is contained in Exhibit K1 (45 pages, including pages 7a, 7b, and 7c).  The Navy's response (specifically, the *documents* the Navy *ultimately* produced in response to Request 10) are in files 10-1 through 10-3, plus pages KK-38 through KK-42 in Exhibit K1.  Plaintiff has not combined all these changes in the Report's releases (changes from late 2015 and 2016) into one smooth-flowing "2015/2016 redaction."  If the Navy has done so, Plaintiff has not seen that smooth-flowing version.

Defendant produced and delivered to Plaintiff in 2015 a complete re-redaction of the Report of Investigation (Exhibit K2).  (The 2015 version retained well over 90 percent of the hundreds of redactions that were withheld in the 2008 version.)  In Exhibit 36 as it appeared in the 2015 redaction, Boorda's Back Seat Notes and telephone memos were completely redacted – everything except the two-page typed cover document.[46]

78.  As a part of the administrative appeal Plaintiff specifically drew attention to the content of Boorda's Back Seat Notes by *excluding* those pages from the appeal of the 2015 redaction.[47] Indeed, those pages were the only redactions Plaintiff excluded from his appeal of FOIA Request 10.  They were excluded from Plaintiff's administrative appeal because the Navy had supposedly already delivered those Back Seat Notes during *Sikes I*.  But this narrow and specific exclusion again called the attention of JAG Headquarters to the content of what the Navy had produced in June 2012.

79.  **In view of these numerous reminders** in paragraphs 70 through 78 of possible discrepancies between Exhibit 36 versus what the Navy furnished as Exhibit 36 in June 2012, and with no effort by the Navy to correct erroneous substitution(s), if any, in the Back Seat Notes as produced during *Sikes I*, **Navy indifference to such June 2012 substitution and Navy refusal properly to address FOIA Request 5 indicates fraudulent intent rather than inadvertent error.**

---

[46] See pages 171 through 181, and pages 442 through 452, both in Exhibit K2, which is the 2015 redaction.

[47] Exclusion from Plaintiff's administrative appeal of the Navy's redaction of Boorda's Back Seat Notes is documented in the top two lines and in footnote 3 on page KK-2 in Exhibit K1.

80. With all of the above reminders, the elephant in the room was so large it could not have remained unnoticed. See also paragraph 38, above, regarding Plaintiff's request to be heard further on this point.

81. If fraudulent intent is found, Plaintiff offers for the Court's consideration the holding in *Payne Enterprises, Inc. v United States*, 837 F.2d 486, 494 (D.C.Cir.1988). In that case the D.C. Circuit found that the Air Force repeatedly and systematically violated the FOIA statute, and found that ordering release of the requested information was insufficient as a remedy. Plaintiff also offers for the Court's consideration the Supreme Court's holding in *Renegotiation Board v Bannercraft Clothing Co.*, (1974) 415 U.S. 1, 94 S.Ct. 1028, 1037-1038. In that case the Supreme Court explicitly found no limit to the equitable relief that can be awarded under the Freedom of Information Act.

82. In view of the considerations set forth above, and as discussed in paragraphs 39 and 40, Plaintiff asks the Court to direct the Navy to provide a proper and authenticated response to FOIA Request 5, which asked for the same material identified in FOIA Request 2:   a complete and correct copy of Exhibit 36 from the NCIS Report of Investigation of Admiral Boorda's Suicide.

## DEVELOPMENT OF THE SECOND CAUSE OF ACTION

83. As noted in paragraph 41, in 2014 **Plaintiff asked the Navy to provide** a correct and properly authenticated answer to FOIA Request 10, which asked for **a copy of the entire, unredacted NCIS Report of Investigation** of Admiral Boorda's suicide.[48] In its response, seen in Exhibit K2, the Navy *did* re-redact the entire Report. In the 2015 version (Exhibit K2), page 34 was released but that page was blurred. Here, in the Second Cause of Action, Plaintiff asks

---

[48] FOIA Request 10, asking for the entire Report of Investigation, unredacted, appears on page KK-4 in Exhibit K1.

the Court to order the Navy (as one alternative; see paragraph 43, above) to provide on the litigation record an authenticated, clearly focused copy of page 34 from Exhibit K2, the (initial) 2015 NCIS redaction of their Report of Investigation of Admiral Boorda's suicide.[49]

84. As someone researching a book on Admiral Boorda, **Plaintiff's *research rationale* for the requested release of this page** is associated with Boorda's involvement in the retirement of RADM Ralph Tindall.  In that incident, which occurred only five months before the CNO's suicide, there appeared widely circulated press coverage of a story involving severe punishment of RADM Tindal.  In the syndicated story originating with the Washington Post, reporter Dana Priest summarized:  "A married two-star Navy admiral who had a yearlong affair with a junior enlisted woman has been found guilty of adultery [a crime under military law], stripped of one star, forced to retire, fined thousands of dollars, and confined to quarters for 30 days."  In the immediate aftermath of Tindal's premature retirement the Navy's chief spokesperson, RADM Kendell Pease, said "RADM Tindal was found guilty of a wholly improper, inappropriate intimate relationship with a subordinate."  In view of Admiral Boorda's own demise five months later, the page from the NCIS Report requested here might shed light on one of the pressures that might have caused the CNO to take his own life.

85. **Plaintiff's *legal foundation* for requesting release** of this document is closely related to that set forth in paragraph 45 and its footnote, above.  Plaintiff maintains that page 34 of the 2015 redaction should be produced by the Navy in clearly focused form, following well settled case law, because page 34 of the 2015 redaction (Exhibit K2) has been released to the public in unredacted (albeit blurred) form, and may be susceptible of being made legible by

---

[49] The Navy's response to Request 10 (seen in Exhibit K2) contained the Report's page 34 (two blurred photos). The Navy later provided on page KK-38 in Exhibit K1 the content of the left photo. The right-side photo is at issue here.

optical enhancing techniques.  As noted in paragraph 45 and its first footnote, above, case law holds that because page 34 of the 2015 redaction has been officially released in unredacted form[50] it cannot be withheld when the same document is subsequently requested.

86. **Comparison with Putative Copy**.  Plaintiff has informally obtained what appears to be a copy of the lower right side of page 34 of the 2015 redaction (-- the Putative Copy).[51]  Page 34 is contained in what the NCIS Report of Investigation calls Exhibit 5.  In the instant action, Plaintiff requests that the Court order the Navy to furnish on the record an authenticated, clearly focused copy of page 34 from the 2015 redaction (Exhibit K2).

87. **However, this request is hereby withdrawn if the Court determines that a clearly focused version of the lower right side of page 34** from the 2015 redaction **is different from the Putative Copy** now in Plaintiff's hands.  In the event that the actual, clearly focused lower right side of page 34 is different from the Putative Copy, Plaintiff asks only that the Navy place on the litigation record an official certification, confirmed by the Court, that the two are different.

---

[50] In the 2008 redaction, the text on page 31 (in Exhibit B2, all of whose pagination is handwritten) refers to what it calls Photographs 1 and 2. Those photos were both withheld in the 2008 redaction, as seen on page 32 of Exhibit B2.

However, seven years later those same two photos were released in their entirety, unredacted (albeit in blurred form), as seen on page 34 (per "typed" pagination) of the 2015 redaction (Exhibit K2).  The contents of the two photos on page 34 in Exhibit K2 (the 2015 redaction) were contained in what is *there* called Exhibit 5.  (This Exhibit number appears at the bottom of page 33 in Exhibit K2.)

It is noted in passing that after Plaintiff submitted FOIA 10 (the request for the entirety of the NCIS Report of Investigation; seen on page KK-4 in Exhibit K1), and after two administrative appeals, the Navy (on pages KK-37 and KK-38 of Exhibit K1) released the entirety of the left side of these two photos.  The left side contained Boorda's notes to RADM Pease and To My Sailors.

It is also noted in passing that in the 2015 redaction (Exhibit K2), there are two distinct documents identified as "Exhibit 5," one beginning on page 33, and a different document (also identified as Exhibit 5) located on page 92. (The same duplication of Exhibit numbering occurred in the 2008 redaction, Exhibit B2, but with slightly different page numbers.)

Fortunately it appears that all other Exhibits in the Report (other than Exhibit 5) are uniquely numbered.  Here, this Complaint relies on page numbers to limit confusion.  As elsewhere noted, in the 2008 redaction the pagination is handwritten (bottom right corner), whereas in the 2015 redaction the pagination is "typed" (i.e., machine produced; appearing at bottom left corner).

[51] Upon receipt of the Putative Copy (see paragraph 88), the comparison is made clear for viewers who go to page 34 of Exhibit K2, and ZOOM IN on that page.

88. At a later stage in these proceedings Plaintiff will identify the source of the Putative Copy and place that Copy on the litigation record.

89. **Balancing of Interests.** Pointing to the privacy interest of the decedent's family, the Navy recommended withholding Boorda's suicide note to his wife,[52] which is known in the NCIS Report as Exhibit 16.[53]

90. As another alternative within the Second Cause of Action, Plaintiff advocates release of Exhibit 16 of the Report.[54]  The FOIA calls for a balancing of interests.  Adultery remains a crime under military law.  With Boorda handing down heavy punishment to another Admiral for such violation, and five months later paying a severely steep penalty for what might have been his own violation, the public should have the right to know the content of Exhibit 16.

Sept. 29, 2016

*Thomas W. Sikes*

Thomas W. Sikes, pro se
P. O. Box 100
Cadwell GA 31009
tom_sikes@hotmail.com
478-689-4248

---

[52] Navy opposition to releasing Boorda's letter to his wife is seen on page KK-10 in Exhibit K1.  Page KK-10 is a portion of the content of a letter dated November 16, 2015 from OJAG to Plaintiff.

[53] Exhibit 16 appears simply as a placeholder on page 115 of the 2015 redaction, which is Exhibit K2.  Exhibit 16 is identifiable as Boorda's letter to his wife by other references included in this Report or associated with its reporting.

[54]  It appears that Exhibit 16 (Boorda's note to his wife) is identical in content to the bottom right portion of page 34 of the 2015 redaction.  But that does not mean we can always use them interchangeably, since, when presented in page 34 of the 2015 redaction, that blurred photo was part of what the Report called Exhibit 5.  (Among other tricky aspects, see penultimate paragraph in footnote 50.)  And there is no *one place* in the Report where it says explicitly that "note to wife" is the same as "the lower right portion of page 34 of the Report."  However, the Navy appears implicitly to accept this equivalence, as seen in the first full paragraph on page KK-10 in Exhibit K1.  Page KK-10 was the Navy's response to that part of Plaintiff's administrative appeal seen in paragraph 2a on page KK-2, also in Exhibit K1.

000 - Table of Contents -- Certain Exhibits -- Sikes follow-on FOIA litigation - 2016

Exhibit A1 - file 01-1 Summary of two Old and eight New FOIA requests - (2 pp)

Exhibit A2 - file 02-1 Summary of EACH ELEMENT of all of the new FOIA Correspondence -- FOIA #3 (the AA pages) thru FOIA #10 (the KK pages) May 12, 2016 (8 pp)

Exhibit B1 - file 03-2 (pages BB-1, ff) - the Navy's (consolidated) REPLY to the administrative appeals of FOIA Requests 3 thru 7 (All denied.) - (14 pp)

Exhibit B2 - file 04-2 the 2008 redaction of the NCIS Report of Investigation - (obtained as byproduct of FOIA #4) Part 1 of 2 (the first 107 pdf pages)

Exhibit B3 - file 04-3 the 2008 redaction of the NCIS Report of Investigation - (obtained as byproduct of FOIA #4) Part 2 of 2 (the final 107 pdf pages)

Exhibit D  - file 05-1 FOIA #5 - (pp DD-1, ff) - asked Navy AGAIN to furnish a copy of Report's Exhibit 36 (very similar to FOIA #2, answered during Sikes I) (32 pp)

Exhibit F  - file 07-1 FOIA #7 - (pages FF-1, ff) - asked for info about Navy's possible furnishing of DIFFERING  documents responsive to FOIA 2 (10 pp)

Exhibit G  - file 08-1 FOIA #8 - (pages GG-1, ff) - asked JAG Hdq to search its OWN files for answers to FOIA Requests 5 and 7 (23 pp)

Exhibit H  - file 08-2 (pp. HH-1, ff) - Info VOLUNTEERED by Navy (initially on page BB-9) by JAG Hdq. First appearance of May 4, 1998 Memo saying Boorda Notes Destroyed (7 pp)

Exhibit J  - file 09-1 FOIA #9 - (pages JJ-1, ff) - This was a five-part FOIA Request, with Parts 1 and 4 of special interest (26 pp)

Exhibit K1 - file 10-1 FOIA #10 - (pages KK-1, ff) - request for ENTIRE unredacted Report (45 pp. 45 pp means pagination through KK-42, plus, 3 more pages -KK-7a, 7b, and 7c.)

Exhibit K2 - file 10-2 the (initial) 2015 NCIS redaction of Report of Invstgn [Apr 2015; see p. KK-12 -- MUST add its E.1 thru E.4 to constitute the (Dec 2) 2015 redaction] (230+ pp)

Exhibit K3 - file 10-3 from p. KK-12 in 10-1 - Encl. 1 from NCIS - 43 pages of Report, with previously omitted exemption codes now Added (43 pp)

Exhibit K4 - file 10-4 from p. KK-12 in 10-1 - Encl. 2 -  suicide notes 1 & 2 (of 3), incl Note to RADM Pease - p. 114 [BUT, observe that p. KK-38 in file 10-1 was produced later] (1 p)

Among the actual correspondence files involving Sikes' recent FOIA
requests applicable to this action, the *back-and-forth correspondence*
(including a little of what the Navy produced) is highlighted in pink, above.

**The remainder of Navy-furnished material is highlighted in green.**